HERSHEL RADIO COMPANY v. PENNSYLVANIA
RAILROAD COMPANY.

1. CARRIERS—DAMAGE TO FREIGHT SHIPMENT—IMPROPER LOADING—
   FINDING OF COURT—EVIDENCE.
   Trial court's finding in nonjury case that damage to freight shipment of radar transformers was by reason of the fact they were not properly secured in the freight car when loaded *held*, not against the preponderance of the evidence.

2. SAME—SHIPPER'S LOAD AND COUNT SHIPMENT—AUTHORITY OF
   RAILROAD AGENT—FINDINGS OF COURT—PREPONDERANCE OF EVI-
   DENCE.
   Findings of trial court that railroad company employee had no authority to approve the loading of freight car for the railroad

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 4]  9 Am Jur, Carriers §§ 465 *et seq.*, 730.
[5]  3 Am Jur, Appeal and Error §§ 530, 685, 691.

and could not assume such authority as to shipment made under shipper's load and count designation, *held,* in accord with, and not against, the preponderance of the evidence in shipper's action for damages to the shipment (49 USCA, § 101).

3. SAME—SHIPPER'S LOAD AND COUNT—PURPOSE OF STATUTE.

The purpose of the statutory provision for insertion in bill of lading of the term *shipper's load and count* is to relieve the carrier for damages caused by improper loading (49 USCA, § 101).

4. SAME—SHIPPER'S LOAD AND COUNT—IMPROPER LOADING—KNOWL-EDGE OF CARRIER'S EMPLOYEES.

Carrier was not liable for damages to freight shipment of radar transformers which had been loaded by the shipper and damage was due to fact that shipment, sent subject to the shipper's load and count, had been improperly loaded, where the carrier's employees had not observed manner of loading nor inspected the loaded car before sealing it (49 USCA, § 101).

5. JUDGMENT—NUNC PRO TUNC CORRECTION AFTER APPEAL.

*Nunc pro tunc* order of trial court to correct judgment entry reciting that defendant's "motion for directed verdict is hereby granted and judgment of no cause of action shall be entered accordingly" in nonjury case so as to render a judgment of no cause of action, as directed in his opinion, *held,* correct and within his statutory power, even though the corrective action was taken after case was on appeal (CL 1948, §§ 616.3, 616.5 [subd 12], 616.6).

Appeal from Wayne; Weideman (Carl M.), J. Submitted October 13, 1955. (Docket No. 6, Calendar No. 46,533.) Decided December 1, 1955.

Action by Hershel Radio Company, a copartnership, against Pennsylvania Railroad Company, a Pennsylvania corporation, for breach of contract of transportation by damage to shipment. Judgment for defendant. Plaintiff appeals. Affirmed.

*Dann, Rosenbaum & Bloom,* for plaintiff.

*Dyer, Meek, Ruegsegger & Bullard,* for defendant.

BUTZEL, J.  Hershel Radio Company, a copartnership, plaintiff, brought suit against the Pennsylvania Railroad Company, a Pennsylvania corporation, defendant, and the Southern Pacific Railroad Company, codefendant.  Upon dismissal of the case against the codefendant (*Hershel Radio Company* v. *Pennsylvania Railroad Company,* 334 Mich 148) plaintiff filed an amended declaration against the Pennsylvania Railroad Company as sole defendant. Pennsylvania's liability, if any, stems from the fact that it is a connecting or delivering carrier. 49 USCA, § 20(11).  Plaintiff contends that defendant is liable for damages to a shipment of electrical and radio equipment sent to Detroit, Michigan, from the Southern Pacific Company's freight yards at its Stockyards station at Oakland, California, where the plaintiff loaded the equipment in a box car furnished by Southern Pacific.  The undisputed evidence shows that the car while en route did not suffer any collision or untoward incident.

Plaintiff obtained the articles in San Francisco, California, from the atomic division of the war assets administration for approximately $4,800.  As purchased they consisted of 200 radar transmitters and 439 motor controls.  The radar transmitters alone originally cost the government $210,000 and had never been used.  On inquiry as to shipping rates it was ascertained that the radar unit rate was substantially higher than that for transformers.  As plaintiff was interested solely in the transformers contained in the radar transmitters he decided to dismantle the latter and ship merely the transformers together with the other equipment.  Plaintiff sent its own agent to attend to the operation and see that the units were taken to and dismantled at a scrap-metal yard and then loaded on the box car for shipment to Detroit.  Some of the equipment purchased was sold in California so that as

sent the shipment consisted of 396 radar transformers (there were 2 in each transmitter), 348 motor controls and 185 motors. The shipping agreement was that the articles were to be loaded and counted by plaintiff and there was written on the bill of lading the letters "SLC." This is the manner of designating "shipper's load and count."

The record indicates and the trial court found as a matter of fact that the articles were not properly secured in the freight car and that this defective loading caused the damage, principally to the transformers. We accept this finding. It is not here urged, nor do we think, that it is against the preponderance of the evidence.

As part of its theory of recovery plaintiff claimed that agents of the Southern Pacific Railroad Company, the initial carrier, saw and tacitly approved of the defective loading of the car. The court found as a matter of fact that the employee involved "had no authority to approve the loading of any freight car for the railroad, nor could he assume such authority. That was entirely without the scope of his employment." The subagent at the Stockyards station testified at the trial that he had not in any way seen or examined the method of loading or approved of it and that it was not part of his duties to superintend or advise as to the loading. The agent and an industrial clerk were the only employees of the railroad at its Stockyards station. The agent further testified that the clerk's duties were to check the cars and make up switch lists for the switching crews and to pick up and sign bills of lading on outbound cars, and that he had no duties or authority to advise shippers in regard to loading. The clerk, a Mr. Heyward, actually made out the bill of lading. He testified that he had been an employee of the Southern Pacific for 31 years, that he had never had occasion to inspect the manner

or method of loading a car or load shipment, that this was not part of his duties, that he had never been consulted by plaintiff as to the manner of loading, that he never entered the car, that during the 2 days the car was being loaded he checked the car for demurrage purposes, and that he put the seal on the car after it had been loaded and closed by plaintiff. Plaintiff's agent in charge of the loading operation testified that an employee of Southern Pacific, apparently Heyward, looked over the loading operation and approved of it and considered it proper. The court, however, considered plaintiff's testimony unsubstantiated. We affirm the findings of fact in this regard as in accord with, and not against, the preponderance of the evidence.

The question presented is, assuming careless loading by plaintiff and the finding as to Southern Pacific's agent's participation in the loading operation, whether defendant is liable for the damage to the shipment sent under the "shipper's load and count" designation. Plaintiff apparently does not deny that these were the terms of the shipment. *Cf., People's Savings Bank of Saginaw* v. *Pere Marquette Railway Co.,* 235 Mich 399.

This shipment is governed by Federal bills of lading legislation, 49 USCA, § 101, which provides in part that:

"The carrier may also by inserting in the bill of lading the words 'shipper's weight, load and count,' or other words of like purport, indicate that the goods were loaded by the shipper and the description of them made by him; and if such statement be true, the carrier shall not be liable for damages caused by the improper loading."

It is a fact that improper loading was the cause of the damage. The patent import of this statute

serves to relieve defendant from any liability in this case.

However, it is plaintiff's contention that despite its own negligence and the "shipper's load and count" designation the carrier may be, and in this case is, liable if it knew of or had the means of knowing of the improper loading of the car. In support of this proposition counsel cites *Thomson* v. *Chicago, Milwaukee & St. Paul R. Co.*, 195 Wis 78 (217 NW 927); *Mitchell* v. *North Pacific Steamship Co.*, 60 Cal App 554 (213 P 293); *S. Valentine & Co.* v. *Atchison, Topeka & Santa Fe R. Co.*, 220 Ill App 188; *Newman* v. *Seaboard Air Line R. Co.*, 188 NC 341 (124 SE 627); *Gehrke* v. *American Railway Express Co.*, 61 ND 668 (240 NW 321; 81 ALR 808); *Kinnick Bros.* v. *Chicago, Rock Island & Pacific R. Co.*, 69 Iowa 665 (29 NW 772); 13 CJS, Carriers, § 78c. While some of these authorities involve reception by the carrier of defectively packaged or crated goods, a situation properly distinguishable from negligent loading of goods in a freight car, there is support for the rule as advanced by plaintiffs. See, generally, 13 CJS, Carriers, § 67b; 9 Am Jur, Carriers, § 730; 19 LRA NS 952; LRA1915C, 1220. For those who adhere to this rule it is apparently considered an unwritten exception to the statute regarding "shipper's load and count" contracts as set forth in 49 USCA, § 101, *supra*. See *Perkel* v. *Pennsylvania R. Co.*, 148 Misc 284 (265 NYS 597).

To the contrary are decisions which hold the carrier not liable where the shipper was at fault in loading, notwithstanding knowledge on the part of the carrier of the shipper's negligence. *Robinson* v. *New York Central R. Co.*, 245 App Div 378 (282 NYS 877), affirmed without opinion, 270 NY 659 (1 NE2d 985); *Ross* v. *Troy & Boston R. Co.*, 49 Vt 364 (24 Am Rep 144); *St. Louis-San Francisco R. Co.*

v. *Glow Electric Co.,* 35 Ohio App 291 (172 NE 425).
One court, in *Illinois Central R. Co.* v. *Rogers &
Thomas,* 162 Ky 535 (172 SW 948, LRA1915C, 1220,
Ann Cas 1916E, 1201), stated (p 539):

"However, as has been seen from the authorities
cited, the great weight of authority supports the
proposition that where the shipper loads the car him-
self, the carrier is not liable for loss or injury aris-
ing from such defective manner of loading, whether
the same be discoverable or not, if not actually
discovered by the carrier. The carrier has a right
to assume that the shipper has loaded the car in a
proper manner; and it does not lie in the mouth of
a shipper whose act or fault in respect to the man-
ner in which he loaded the car has resulted in loss
or injury to his property, to say to the carrier that
it might have discovered such improper loading by
inspection. The shipper may not thus derive ad-
vantage from his own wrong."

The Federal courts are in seeming disagreement
as to what is the correct and proper rule. Compare
*South Carolina Asparagus Growers' Assn.* v. *South-
ern R. Co.* (CCA, 1931), 46 F2d 452, 454, 455, with
*Modern Tool Corp.* v. *Pennsylvania R. Co.* (D NJ,
1951), 100 F Supp 595, 597, 598. *Cf., Standard Hotel
Supply Co., Inc.,* v. *Pennsylvania R. Co.* (SD NY,
1945), 65 F Supp 439, 442; *Blytheville Cotton Oil
Co.* v. *Kurn* (CCA, 1941), 155 F2d 467, 470. In short,
some say the railroad is liable if it knew or could
have found out, some say it is not liable even if it
knew, and some say it is not liable unless it actually
knew, whether discoverable or not, about the ship-
per's fault in loading. There has been expressed
no readily discernible "majority" or "better" rule
and to say that there has is to ignore some cases and
emphasize others, all equally pertinent.

Whatever the rule, however, we must consider the
facts of the instant case. The court below found the

only 2 employees in the Stockyards station unable to conduct an inspection because such would have been contrary to their authority, as well as custom and practice. The court chose generally to believe the testimony of the clerk Heyward who, to reiterate, testified that he saw the car twice, once empty and once while being loaded; that he did not observe the manner in which it was being loaded; that he did not have any conversation with regard to the manner of loading, and that he did not look into the closed car prior to sealing it. With these facts we must affirm the decision for defendant, even under plaintiff's view of the law. Plaintiff did not establish the fact of an inspection or approval, or Southern Pacific's agent's authority to conduct one, or that it could have been conducted at the Stockyards station where the car was loaded. Therefore, we need not consider or decide which is the "better" rule of law.

The terms of the "judgment decree" entered on the court below were that defendant's "motion for directed verdict is hereby granted and judgment of no cause of action shall be entered accordingly." Relying upon this plaintiff argued in its brief on appeal that the court erred in granting the motion for directed verdict because "the 'Empson' act,[*] which permits the trial court to reserve decision on a motion for directed verdict does not apply to a case heard without a jury."

The opinion written by the court below concluded with the following:

"The plaintiff having failed to prove its case by a preponderance of the evidence, a judgment of no cause of action will be rendered in favor of the defendant, with costs to be taxed."

---

[*] CL 1948, § 691.691 (Stat Ann 1953 Cum Supp § 27.1461).—Reporter.

The error of the clerk in basing the judgment on the motion for directed verdict instead of the grounds set forth in the opinion was discovered by defendant on reading plaintiff's brief in this Court and upon proper motion it was brought to the attention of the court below. At the hearing the judge stated that he did not grant the motion for directed verdict, but that he "rendered a judgment of no cause of action after hearing the testimony by both sides, and did not grant it on the motion by defendant's counsel." There was some discussion as to the power of the court to make such a correction once the case was in the Supreme Court but the judge ordered the judgment corrected *nunc pro tunc*. These facts appear in the supplemental record on appeal filed by the parties and stipulated by them as containing the pleadings and proceedings had in this cause since the settlement of the original record. It was duly certified by the trial judge. We think the trial judge correct in his action and within his statutory power. CL 1948, §§ 616.3, 616.5 (subd 12), 616.6 (Stat Ann §§ 27.840, 27.842 [subd 12], 27.843). See *Grand Rapids Savings Bank* v. *Widdicomb*, 114 Mich 639.

Judgment affirmed, with costs to defendant.

CARR, C. J., and SMITH, SHARPE, BOYLES, REID, DETHMERS, and KELLY, JJ., concurred.