**PANHANDLE & S. F. RY. CO. et al. v.**
**MONTGOMERY.**

No. 5132.

Court of Civil Appeals of Texas. Amarillo.
March 25, 1940.

Rehearing Denied May 13, 1940.

Terry, Cavin & Mills, of Galveston, S. D. Stennis and Sturgeon & Sturgeon, all of Pampa, and Hoover, Hoover & Cussen, of Canadian, for appellants.

John F. Studer and Willis & Via, all of Pampa, for appellee.

FOLLEY, Justice.

This is an appeal from a judgment in the sum of $2,760 recovered by the plaintiff, S. J. Montgomery, against the defendants, Panhandle & Santa Fe Railway Company and the Southern Pacific Company, for damages in connection with a shipment of 383 head of feeder stock calves from Mos-

quero, New Mexico, to Mendota, Texas. Such cattle were shipped without a caretaker.

The plaintiff alleged in substance that he delivered the 383 head of cattle to the Southern Pacific Company at Mosquero, New Mexico; that they were loaded on the cars of such railway company at such place and by it transported to Tucumcari, New Mexico, where they were accepted by the Rock Island Railway Company; that the latter company transported the cattle to Amarillo, Texas, where they were delivered to the Panhandle & Santa Fe Railway Company, which company transported them to Mendota, Texas; that the cattle were delivered to the Southern Pacific Company on October 30, 1937, in good condition; that the cattle were unreasonably delayed and unreasonably unloaded and handled in pens and kept en route longer than thirty-six hours; that such cattle were improperly bedded in cars containing some sort of cinders which emitted a pungent and irritating dust which caused a sinus and bronchial infection among the cattle; that the plaintiff and his agent did not know the vicious properties of such dust until after the shipment was made; that the defendants only delivered to the plaintiff 368 head of cattle alive at Mendota; that seven of these were delivered in a dying condition and did die shortly thereafter; that three more head died within a period of three months and six more died during the following summer; that the remainder of the cattle were delivered in a badly damaged condition; that the bedding so furnished, together with the delays and mistreatment of the cattle during shipment, constituted negligence on the part of the defendants which proximately caused the injuries to the cattle; and that by reason of such injuries plaintiff was compelled to feed extra cake to the cattle of the value of $150 and had to administer vaccine of the value of $45. Plaintiff sought damages in the sum of $30 per head for the dead and missing cattle and $5 per head for the remainder of the cattle.

After filing a general demurrer and general denial, the defendants alleged that the plaintiff undertook to load the cattle at Mosquero and that his agents inspected and accepted the cars with the bedding furnished by the initial carriers; that such inspection and acceptance of the bedding in such cars precluded a recovery of any damage which was occasioned thereby; that

before loading the cattle they were driven on a hot day a distance of many miles to the point of shipment and arrived at Mosquero late in the afternoon in a run-down, hot, panting and weakened condition; and that if any of such cattle were injured or died en route such was caused by the manner in which they were driven to the shipping point or by their inherent weakness.

The cause was submitted to a jury the findings of which acquitted the defendants of all acts of negligence except that alleged in regard to the bedding furnished in the cars at Mosquero. It was upon the remaining findings of the jury that the judgment was based. These findings in substance were as follows: That the plaintiff's cattle at the time they were loaded for shipment were in proper condition to be shipped; that 373 head of plaintiff's cattle were injured; that 383 head were loaded in the railway cars at Mosquero; that the bedding furnished at Mosquero was not the proper bedding for cattle; that the furnishing of such bedding was negligence and the proximate cause of the injuries and death of the cattle; that the market value of the cattle at the time and in the condition in which they arrived at Mendota was $24 per live head; that had such cattle been delivered in the exercise of ordinary care their market value would have been $30 per head; that it was necessary to administer vaccine to the cattle on account of their condition at the reasonable cash value of $45; that on account of the injured condition of the cattle it was reasonably necessary to feed plaintiff's cattle extra cake of the reasonable value of $150; that the cattle were not in a hot or panting condition or in an emaciated or run-down or weakened condition at the time they were received by the Southern Pacific Company for shipment; and that the agent of the plaintiff did not know how the cars in question were bedded at the time the cattle were loaded. The court thereupon rendered judgment for the plaintiff against both defendants in the sum of $2,760; the manner of arriving at such sum we shall later discuss.

 Since the evidence shows that the bedding was furnished by the Southern Pacific Company at Mosquero, New Mexico, the defendant Panhandle & Santa Fe Railway Company contends that it was error for the court, under the above verdict of the jury, to render judgment

against it. Neither of the defendants sought any relief as against the other in the pleadings upon which the trial was had. Therefore, the question of contribution or that of adjusting the equities, if any, of the defendants as between themselves was not before the trial court and is not properly before this court. This being an interstate shipment of cattle the recovery will be governed by Title 49 of U.S.C.A. § 20, Par. (11), with reference to interstate shipments. This act as it now exists, we think, clearly implies that "any common carrier delivering property received for transportation in interstate commerce, and transported, is liable to the owner thereof for any damage caused by such delivering carrier or by the carrier originally receiving it or by any intervening carrier over whose line the property has passed; and, accordingly, the delivering carrier will be held liable thereunder in an action by the shipper for damages caused by the other carriers." 13 C.J.S., Carriers, pp. 929, 930, § 424. The assignment will therefore be overruled. Stinson v. Yazoo & M. V. R. Co., La.App., 159 So. 422; Bonfiglio v. New York, N. H. & H. R. Co., 292 Mass. 287, 198 N.E. 236; Perkel v. Pennsylvania R. Co., 148 Misc. 284, 265 N.Y.S. 597.

■ The defendants also assert that since the jury found the cattle were transported from the point of origin to the point of destination with ordinary care and reasonable diligence the presumption of law is that the damaged condition in which the cattle were delivered was due to the inherent vice of the animals and not to any negligence of the defendants, and therefore the court erred in rendering judgment herein. We think it sufficient to say that the jury made no such finding. On the contrary, the jury found that the cars were improperly bedded and that such improper bedding was negligence and the proximate cause of the injuries.

By numerous propositions, most of which are mere repetitions, the defendants attack the finding of the jury with reference to the improper bedding in the cars, and, as an incident thereto attack the judgment based upon such finding. They assert, first, that the agents of the plaintiff inspected the cars before they were loaded, that such agents accepted such bedding without complaint and therefore the plaintiff was estopped to claim any damages by reason of the injuries caused by such bedding. Secondly, they assert that the evidence showed that cinders are commonly used as bedding for cattle and therefore the defendants exercised ordinary care in furnishing such bedding as is customarily used for shipments of cattle.

■ The evidence shows that the plaintiff purchased his cattle near Mosquero a short time before they were shipped. Roy Mathers, his friend and neighbor also purchased other cattle near Mosquero about the same time. The plaintiff did not go in person from his home in Miami, Texas to Mosquero to load his cattle but sent his employee, C. L. Dial, to attend to the shipping. Since Mathers was to ship his cattle at the same time and by the same train the plaintiff requested him to assist Dial in loading plaintiff's cattle, however, the testimony failed to show that Mathers had any authority from the plaintiff to accept or reject the cars upon which plaintiff's cattle were loaded. Mathers' cattle were placed in two cars of the train and plaintiff's were loaded in six other cars, all of which were bedded with cinders. Dial did not inspect the cars and was absent at least part of the time while they were being loaded. His testimony was to the effect that he did not take part in the loading of the cattle but was at the depot near the stock pens most of the time while they were being loaded. The cattle in question were placed in the stock pens after having been driven from a nearby ranch where they were purchased and while in these pens were inspected by the cattle inspector. Mathers did see the bedding in the cars and was present while all the cattle were being inspected and loaded. His testimony was that his cattle were loaded first and that when the first car was loaded a fog of dust was emitting from the car as the door was closed. He further testified that such dust caused him to sneeze and cough and seriously affected his breathing. He stated that the cars into which the plaintiff's cattle were loaded were in the same condition. However, this witness further testified that although he saw such fog emitting from the cars he did not know what condition it would produce in the cattle. In connection with this testimony the court at the request of the defendants, submitted the following issue: "Do you find from a preponderance of the evidence that the agent

of the plaintiff knew how the cars in question were bedded at the time plaintiff's cattle was loaded into them?" This issue the jury answered in the negative. This issue as presented and answered was an implied finding that Mathers was not the agent of the plaintiff and that Dial did not know the condition of the cars, and there was sufficient testimony to sustain such findings. The evidence showed that neither Mathers nor Dial had ever shipped cattle where cinders were used as bedding and if Dial had seen the bedding he would, no doubt, have known no more about the evil effect of such bedding than Mathers. Under such circumstances we think the defendants failed to establish the defense that the plaintiff, through his agents, examined and approved the bedding used in the transportation of the cattle. 8 Tex.Jur. 465, para. 314.

 It is also our opinion that the defendants would not be excused from negligence with reference to the bedding by simply showing that cinders are commonly used as such. They must go further, we think, and show that the cinders actually used in this shipment of cattle were the same sort of cinders which are commonly used by carriers of livestock. This burden the defendants failed to discharge. The agent of the Southern Pacific Company at Mosquero testified that his company used cinders wholly for bedding in cattle cars and admitted that all the cars in question were so bedded. There was other testimony that cinders had been habitually used by such railroad and by many other carriers for many years. However, the agent at Mosquero did not know where the particular cinders in question came from nor when or where the cars had been bedded. There was no testimony to show the origin or exact quality of the cinders and the evidence as a whole fails to show that they were precisely the same identical sort that were commonly used by railroad carriers. The agent for the Southern Pacific Company at Tucumcari testified that cinders were commonly used as bedding and that they were considered very good bedding, however, he admitted on cross-examination that it was not customary for the Southern Pacific or any other railroad to use cinders which emitted a cloud of dust when trampled upon.

 The plaintiff's witnesses established the fact that a fog of dust and fumes arose from the bedding used which entered the eyes and nostrils of the cattle and of the witnesses, causing both man and animal to sneeze and cough. When the cattle were delivered at Mendota they were still sneezing and coughing and their noses were running. They were also in a weak and emaciated condition from which the testimony shows they never fully recovered. The defendants admitted that two head of plaintiff's cattle were dead at Tucumcari and that three more were dead in the cars upon arrival at Mendota. The jury found that 383 head of cattle were loaded for plaintiff at Mosquero, while it was shown without controversy that only 368 head were delivered alive at Mendota, which was 15 head less than loaded. In regard to the 10 head not accounted for among the 15 short, the defendants attempted to show that only 373 were actually loaded at Mosquero, but the jury resolved this issue against the defendants upon controverted testimony. The plaintiff's witnesses further established the fact that of the 368 live head delivered at Mendota, one died within thirty minutes after being unloaded, another died the same week, 6 more died within ten days, 2 more died a little later and 1 more died the following spring. Therefore the aggregate of the dead and missing was 26 head, 5 of which admittedly died en route, 10 were missing and unaccounted for and 11 died after delivery. The testimony was further to the effect that the 357 head which finally survived were in a greatly damaged condition from which they had not recovered the following summer. Under such circumstances we think the evidence was ample to support the finding that the cars were improperly bedded and at the same time to overcome the defensive theory that the cinders used in this shipment were the same sort commonly used in shipping cattle. Certainly no such ill effects as these commonly occurred in the use of cinders as bedding and therefore the presumption prevails that although cinders were used in this shipment they were not the identical sort commonly used by the Southern Pacific Company or by any other carrier of livestock, but on the contrary possessed some vice which the cinders commonly used did not contain.

 The defendants next contend the court erred in permitting the witnesses C. L. Dial and Millard Donaldson to testify as to the market value of the cattle at Mendota and further erred in submitting the

issue as to market value based upon such testimony. This assignment is based chiefly upon the fact that only a few people resided at Mendota and no cattle were shown to have been sold at such place for several years. Each of these witnesses was a cattle man of long experience and was familiar with the value of cattle generally at Mendota, at Miami, which was fourteen miles from Mendota, and at Canadian, which was only seven miles from Mendota. The testimony of these witnesses was to the effect that the market value was the same generally in that section of the State and we think they showed themselves qualified in every respect to testify to the value of cattle at Mendota. Rogers & Adams v. Lancaster et al., Tex.Com.App., 248 S.W. 660; Galveston, H. & S. A. R. Co. v. Saunders, Tex.Civ.App., 141 S.W. 829, writ refused; Chicago, R. I. & G. R. Co. v. Swaggerty, Tex.Civ.App., 163 S.W. 317, writ refused; O'Brien v. McDow, Tex.Civ. App., 8 S.W.2d 561, writ dismissed.

The contention is next made that the court erred in permitting the witness Dial to testify that he did not notice that the cattle regained their weight but he did not think they did. The defendants assert that the court overruled their objections to such testimony. Upon checking the statement of facts we find such not to be the case. The court sustained the objections to such testimony and instructed the jury not to consider it. The assignment is therefore overruled.

Another proposition is presented in connection with the court's permitting the witness Roy Mathers to testify that the bedding used was not "proper bedding". The defendants contend such testimony invaded the province of the jury. If such testimony constituted an invasion of the province of the jury, which we doubt under the record presented, the defendants are in no position to complain about it. They introduced numerous witnesses who testified that cinders constituted proper bedding. Moreover, the witness Mathers, who had been in the cattle business for forty-six years, was shown to have had considerable experience in shipping cattle. His testimony in regard to the bedding was in the realm of expert testimony concerning a matter about which the jury was not calculated to have been so well informed. The assignment is overruled. 8 Tex.Jur. 573, para. 403.

The further contention is made that the court erred in refusing to submit certain requested issues relative to the inherent weakness and condition of the cattle at the time they were delivered for shipment. We think such matters were amply covered in the court's main charge. As above stated the jury found the cattle were in proper condition to be shipped and that they were not in a hot and panting condition nor in an emaciated or run-down or weakened condition. The pleadings and the evidence raise no issues other than these as to the condition of the cattle at the time they were shipped. It was therefore not error for the court to refuse to submit issues which in effect were mere repetitions of issues already submitted.

Although the defendants have not raised the question in their brief we think there is fundamental error presented in the record by reason of the double recovery allowed in the judgment in connection with the $45 for the vaccine and the $150 for the extra cake fed to the cattle. The plaintiff pleaded and proved the difference in the market value of the cattle at destination in the condition in which the cattle should have been delivered but for the carrier's negligence and the condition in which they were actually delivered. It was upon this pleading and evidence that the issues of damages were submitted to the jury and upon the findings in response to such issues that the judgment was predicated. It has been held repeatedly that such difference in the market value is the measure of the shipper's damages, but to add to this damage sums expended thereafter for care and treatment of the cattle would, under the pleadings and facts of this case, amount to a double recovery. In this case the damages allowed at the time of delivery as measured by the difference in market value of the cattle would compensate the plaintiff for all damages of whatever nature suffered by him in the shipment. It is therefore apparent that the court committed fundamental error in rendering judgment for the total sum of $195 for the care and treatment of the cattle after their delivery. Lancaster et al. v. Whittle, Tex.Civ.App., 210 S.W. 334; St. Louis & S. W. Ry. Co. of Texas et al. v. Foster, Tex.Civ.App., 89 S.W. 450; International & G. N. R. Co. et al. v. Startz, 37 Tex.Civ.App. 51, 82 S.W. 1071; Texas & P. R. Co. v. Prunty, 111

Tex. 162, 230 S.W. 396; Texas & N. O. R. Co. v. Lide et al., Tex.Civ.App., 117 S.W.2d 479; Gulf, C. & S. F. R. Co. v. Stanley, 89 Tex. 42, 33 S.W. 109; Gulf, C. & S. F. R. Co. v. Helms Bros. Tex. Civ.App., 210 S.W. 853; Ft. Worth & D. C. R. Co. v. Allen, Tex.Civ.App., 189 S.W. 765.

█ Moreover, irrespective of the vice in connection with this double recovery we doubt the findings of the jury relative to these items were sufficiently definite to charge the defendants therefor if they were otherwise allowable. The issues submitted as to such expenses did not restrict the necessity for the vaccine or the extra cake to such necessity as was occasioned by the negligent conduct of the defendants or by reason of injuries proximately caused by them. Furthermore, with reference to the vaccine the plaintiff testified that he always administered such vaccine merely as a routine matter and that he would have vaccinated his cattle if he had purchased them just across the fence from his own pasture and this regardless of their condition.

█ We think there is also other fundamental error in the record which has not been presented in the brief of the defendants. The judgment herein was rendered upon the motion filed by the plaintiff. In such motion the plaintiff asked for judgment for $30 per head for the 26 head of cattle which died or were missing and for $5 per head for the remaining 357 head which survived, the limit of $5 being asked for the surviving cattle because such sum was the maximum pleaded by the plaintiff. Such motion was granted and judgment so rendered for $780 for the 26 head of dead or missing cattle, $1,785 for the 357 head which survived, $45 for the vaccine and $150 for the extra cake fed to the cattle by reason of the injuries, making a total of $2,760. In response to special issue No. 8 the jury found that "the market value of plaintiff's cattle per head at the time and in the condition in which they arrived at Mendota" was "$24.00 per live head". In response to special issue No. 9 the jury found the market value per head of plaintiff's cattle would have been $30.00 at the time and in the condition in which they would have been delivered in the exercise of ordinary care. From these two findings it will be seen the jury, in effect, fixed $6 as the damages to the live head and $30 for the dead and missing. But what "live head" did the jury have reference to? Was it the 368 live head which came off the cars at Mendota, 11 of which later died, or was it the 357 head which finally lived after the 11 had died? These 11 head which died after delivery were alive when delivered and certainly they formed a part of the "condition" of the herd upon arrival at Mendota. It is entirely possible the jury in fixing the value of the "live head" at $24 had in mind the aggregate value per head of the 368 cattle delivered, 11 of which later died. Particularly might this be true since issue No. 8 inquired as to the value of the cattle "at the time and in the condition in which they arrived at Mendota". If the jury had such in mind judgment was rendered for $275 more than this portion of the verdict authorized. As calculated by the court, judgment was rendered in the total sum of $2,565 as damages to the cattle independent of the amounts expended for vaccine and cake. Of this amount $780 was for the 26 head which were missing or dead, and $1,785 thereof was $5 per head for the 357 which survived. If the jury, in fixing the value of $24 for the live cattle, meant for such value to apply to the 368 head delivered alive regardless of the fact that 11 of them later died, the sum of $2,565 in damages thus assessed in the judgment is excessive. The 368 head, at $5 per head under the limitations of plaintiff's pleadings, would amount to $1,840. The 15 head either dead or missing before the delivery of the 368 would, at $30 per head, amount to $450, which, with the $1,840, would aggregate the sum of $2,290 as damages for injuries to the cattle independent of the damages for vaccine and cake, or a sum of $275 less than fixed by the court upon the verdict of the jury. In other words, instead of allowing $30 per head or $330 for the 11 which died after delivery, as the court did, it is possible the jury had in mind only $6 for these 11 as well as the other 357 which were delivered at Mendota, which, under the limitations of the plaintiff's pleadings, must be reduced to $5 per head or $55 for these 11 cattle, instead of the $330 allowed in the judgment, thus making the $275 difference.

█ There are only two constructions in this respect which possibly could be placed upon the verdict of the jury. One is, in keeping with the court's judgment, that the jury did not mean to include the 11 head of cattle which died after delivery

in the valuation of $24 per live head. The other is the interpretation that the jury intended to include the 11 head in such valuation which possibility has given rise to the error in the judgment. However, if the defendants receive the benefit of the construction of the verdict most favorable to them they could not be prejudiced in any manner in this respect. If the judgment should be reduced in the sum of $275, the amount of the discrepancy in the only two possible constructions to be placed upon this portion of the verdict, we can see no possible harm that could result to the defendants. Therefore, a remittitur by plaintiffs for the amount of $275 for this discrepancy plus the $195 for the vaccine and extra cake would cure all possible defects in regard to the excessiveness of the judgment. Under this record a recovery of $1,840 for the 368 cattle delivered at $5 per head and of $450 for the 15 head dead or missing before delivery at $30 per head, a total of $2,290, would do no violence either to the jury's verdict or to the defendants.

 The trial court allowed interest at 6% on $1,785 of the amount of judgment rendered from November 1, 1937, the date of the delivery of the cattle at Mendota. This was an allowance of interest as damages upon the amount of damages sustained to the 357 head of cattle which survived. No interest was allowed for the dead and missing cattle nor for the vaccine and extra cake. The plaintiff in his petition asked for interest at 6% upon the full sum of $2,885, the total amount claimed in the petition, from November 1, 1937, the date of the injuries. We think the authorities are now uniform to the effect that under proper pleadings interest may be recovered as a matter of law, not as interest eo nomine, but as damages upon the amount of damages found to exist at the time of the injuries, provided, in a case tried before a jury, that such jury has not already included such interest as damages in its verdict. Ewing et al. v. Wm. L. Foley, Inc., 115 Tex. 222, 280 S. W. 499, 44 A.L.R. 627; Davis, Agent, v. Morris, Tex.Civ.App., 32 S.W.2d 255, writ refused; Miller et al. v. Miller, Tex.Civ. App., 292 S.W. 917, writ refused; Settegast et al. v. Timmins et al., Tex. Civ.App., 6 S.W.2d 425, writ refused; Watkins v. Junker, 90 Tex. 584, 40 S.W. 11; Schaff v. Hill & Thompson, Tex. Civ.App., 238 S.W. 1037; Texas & P.

R. Co. v. Erwin, Tex.Civ.App., 180 S. W. 662; Ft. Worth & D. C. R. Co. v. Greathouse, 82 Tex. 104, 17 S.W. 834; Texas & P. R. Co. et al. v. Murtishaw, 34 Tex.Civ.App. 447, 78 S.W. 953; St. Louis Southwestern R. Co. et al. v. Buice, Tex. Civ.App., 251 S.W. 584. The issues as to damages herein submitted to the jury, which inquired as to values at the time of delivery of the cattle, could not reasonably have included interest thereafter accruing as a part of such damages. Therefore, we think the plaintiff would be entitled to recover 6% per annum interest as damages on the sum of $2,290 from November 1, 1937, until paid.

If the plaintiff within ten days from the date of this opinion files a remittitur for the sum of $470 for the excessive recovery in the judgment as above outlined, the judgment of the trial court will be reformed so as to allow the plaintiff a recovery against the defendants for $2,290 with interest thereon as damages at 6% per annum from November 1, 1937, until paid, and for costs of the trial court but not of this court, and as so reformed, the judgment will be affirmed. Unless such remittitur is filed within the time allowed the judgment will be reversed and the cause remanded.

On Motion for Rehearing.

The plaintiff has filed the remittitur within the required time as indicated in our original opinion and the judgment of this court has been entered reforming and affirming the trial court judgment in keeping with the statement in our original opinion.

In a motion for rehearing the defendants for the first time present the contention that the pleadings of the plaintiff were insufficient to support the judgment of the trial court. In this connection they assert that the plaintiff in his original amended petition charged that the cattle were damaged by reason of rough handling, unnecessary delay and failure to properly feed and water the cattle en route; that in his supplemental petition plaintiff for the first time charged that the cattle were damaged by reason of the bedding used; and that under the law and rules of court applicable to such a situation the supplemental petition could not afford an independent basis for recovery upon a cause of action which was not asserted in the amended original petition.

In the amended original petition the plaintiff alleged that the cattle were delivered to the initial carrier in good condition and that they were received by plaintiff from the delivering carrier in a badly damaged condition and in a "sneezing and wheezing condition". The defendant Panhandle & Santa Fe Railway Company, in its first amended original answer, was the first party in this law suit to specifically mention the bedding of the cars. In such answer the Santa Fe alleged that the plaintiff through his agents inspected the bedding of the cars into which the cattle were loaded at Mosquero and accepted the cars in their then condition. It was further alleged that such inspection and acceptance precluded a recovery by the plaintiff for damages, if any, resulting from the bedding of the cars. Following the filing of this amended answer the plaintiff filed his first supplemental petition rebutting such allegations of the railway company and alleging specifically for the first time the vices and defects of the bedding as being the cause of the injuries. This supplemental petition was addressed to the answer of the Santa Fe and also to the answer of the Southern Pacific Company, which latter company had adopted the pleadings of the Santa Fe.

 The defendants at no time excepted to the allegations in the supplemental pleadings of the plaintiff but on the contrary joined issue with the plaintiff on the matter thus raised by not only introducing testimony relative thereto but also in seeking and obtaining the submission of a special issue in connection therewith. In fact, this issue became the major controversy in the trial court and by the briefs of all the parties herein was made the major issue in this court. While we recognize the general rule that the plaintiff cannot recover a judgment upon a cause of action asserted only in a supplemental petition (Service Parts Co., Inc., v. Bizzell et al., Tex.Civ.App., 120 S.W. 2d 919, and authorities cited), we also recognize the general rule of equal dignity that a defendant may by its conduct waive such a defective presentation of plaintiff's cause of action. Galveston, H. & S. A. R. Co. v. Pennington et al., Tex. Civ.App., 166 S.W. 464; Glenn v. Dallas County Bois D'Arc Island Levee Dist., 114 Tex. 325, 268 S.W. 452; Aniol et al. v. Aniol et al., Tex.Civ.App., 62 S.W.2d 668; St. Louis Southwestern R. Co. of Texas v. Larkin, Tex.Civ.App., 34 S.W.

2d 693; Stephens v. Anson Motor Co., Tex. Civ.App., 21 S.W.2d 699. In this connection it has been repeatedly held that in the absence of an exception a supplemental petition may be considered as an amendment to the cause of action alleged in the original pleadings. Crow v. First Nat. Bank of Whitney, Tex.Civ.App., 64 S.W.2d 377, writ refused; Wilson v. Hagins, Tex.Com.App., 50 S.W.2d 797; Citizens' Mutual Life & Accident Ass'n of Texas v. Ragle, Tex.Civ.App., 81 S.W.2d 264; Stallings et al. v. Williams, Tex.Civ. App., 235 S.W. 636; Johnson et al. v. White, Tex.Civ.App., 27 S.W. 174, writ denied; Lemp v. Armengol et al., 86 Tex. 690, 26 S.W. 941; Rains v. Wheeler, 76 Tex. 390, 13 S.W. 324. The reason for the latter rule is apparent on its face. As expressed in some of the authorities on the subject, it would be inequitable for a defendant to join issue with the plaintiff upon a cause of action asserted only in a supplemental petition and thereby gamble with his adversary on the outcome of the issue thus presented, and then, in the event of an adverse judgment, permit the defendant for the first time to successfully urge that the plaintiff had not correctly pleaded such cause of action. It is therefore our opinion the pleadings of the plaintiff under the record presented are sufficient to support the recovery herein.

The motion for rehearing is overruled.